HARRY G. RUNKLÉ et al.

*v.*

WILLIAM E. R. SMITH, executor, et al.

[Decided March 5th, 1919.]

1. Under the Orphans Court act an allowance to an executor of three and one-half per cent. commissions is not excessive.

2. Application to charge against the estate certain sums paid by the executor to his business partners for services rendered to the estate will not be allowed where the affidavits submitted do not show the value of the services, and such services must be considered as part of the services performed by the executor.

3. In an estate of $2,289,000 the allowance of $35,000 to the counsel of the executor for their services in bringing and defending ten separate suits, and attending to many other matters, and of $11,000 to the counsel for the residuary legatee, who filed the bill resulting in the administration of the estate by this court, and completed an involved litigation, is not excessive.

4. Final allowance of commissions and counsel fees will be awarded regardless of whether certain assignees of the residuary legatee will be paid. Such assignees stand in the shoes of the residuary legatee, and have no greater rights than he has.

5. Where a part of the litigation connected with the administration of the estate had to do with the application of a trust fund created by the will, the income of which was to be paid to the residuary legatee and his children, such trust fund, or the income thereof, is chargeable with a proportion of the counsel fees allowed to the counsel for the residuary legatee.

On bill. On application for allowances.*

*Mr. Frank S. Moore,* for the complainant, *pro se.*

*Messrs. Church & Harrison (Mr. Church),* for the executor and *pro se.*

*Messrs. Lindabury, Depue & Faulks (Mr. Ashmead), Messrs. McCarter & English (Mr. Egner), Messrs. Vredenburgh, Wall*

& *Carey* (*Mr. Carey*) and *Mr. William A. Coddington,* all for holders of assignments, objecting.

LANE, V. C.

This is an application by counsel for complainant and by the executor and his counsel for final allowances of commissions and counsel fees. There is also an application for permission to charge against the estate two items of $2,500 each paid by the executor to his partners in business, Charles P. Smith and Edward B. Archer, for services rendered to the executor in the performance of his duties. The executor has already been paid $50,000 on account and asks for $25,000 additional. Church & Harrison, solicitors for the executor, have already been paid $25,000 and ask for $10,000 additional. Frank S. Moore, counsel for complainant, has already been paid $3,500 and asks for $7,500 additional. These allowances are objected to by counsel representing the holders of assignments made by the residuary legatee, who take the position that, so far as the executor and his counsel are concerned, they have already been overpaid. With respect to counsel for complainant, while they do not take the position that he is not entitled to an additional allowance, yet they object to the amount. They also object to the charge against the estate of the $5,000 asked to be charged by the executor.

Upon the making of what has been termed the final decree in this case on August 8th, 1917, and the filing and passing of an intermediate account by the executor the allowances that are stated as having been granted were provided for. At that time the executor asked for $100,000, his counsel for $50,000 and counsel for complainant for a sum in excess of $3,500; it has escaped my recollection what the sum actually asked for was. The allowances made were on account, whether so expressed in the decree or not. I have a distinct recollection of the circumstances, and it was after consultation with the chancellor that I made the allowances concluding that, in any event, final allowances would amount to the figures heretofore referred to. Upon this application the entire administration of the estate

is before the court, and allowances are to be fixed for all of the work done, credit being given for the amounts which have been paid on account. It will be observed that the amount that the executor now asks is $25,000 less than what he asked on the intermediate accounting; the amount that counsel now asks is $15,000 less than asked on the intermediate accounting. It is represented to the court that the executor and counsel have cut the amount asked for solely because there is not sufficient in the residuary estate to pay more and resort would have to be had to the income accruing on the trust fund hereafter referred to of Harry G. Runkle. The action of the executor and counsel was not due to a belief on their part that what they originally asked for was excessive. I acquit the executor and counsel of any intent on their part to ask more, at any time, than what they thought they were reasonably entitled to.

The fixing of commissions and counsel fees is a most delicate matter and one that always gives the court great concern. The rules which must govern the court are well settled. The Orphans Court act provides (*3 Comp. Stat. p. 3860 § 129*) that where the receipts of the estate exceed the sum of $50,000 (as in this case), compensation should be determined according to the actual services rendered, not exceeding five per centum on all sums which come into the hands of the executor. In *Weeks* v. *Selby, 61 N. J. Eq. 668,* the court of errors and appeals affirmed the opinion of the Essex county orphans court, written by Justice Fort in which he said: "The question, then, simply is what commissions shall be allowed the executor, in this intermediate account, for his 'pains, trouble and risk' in the 'actual services rendered' by him to the estate." In that case there was no litigation, no difficulty in gathering the estate together; the investments were the same as those of the testator and an allowance of one per cent. on an estate of $1,197,501.57 was granted. The present chancellor, then vice-ordinary, in *Lyon* v. *Bird, 79 N. J. Eq. 157* (at *p. 164*), said: "The allowance of commissions on principal and on the collection and disbursement of income must be made with reference to the actual pains, trouble and risk of those administering the estate; and commis-

sions on the principal where the estate, as in this. case, exceeds $50,000, must be determined with reference to the actual services rendered, and the maximum rate should be allowed only when clearly earned—never for the mere asking." In *Rogers* v. *Hand, 39 N. J. Eq. 270,* the ordinary (Runyon) allowed three and a half per cent. on an estate of $289,000 where the whole time occupied was one year and said: "The executors have had charge of a large amount of money; have been compelled to bring and conduct suits; have been compelled to make investigations so as to ascertain what land, exactly, the testator owned, and have had to sell land under the power given to them by the will," &c., &c. In *Metcalfe* v. *Colles, 43 N. J. Eq. 148,* on an estate of $150,000 four per cent. was allowed where the executor's office was not a laborious one, where he employed lawyers, brokers, agents and servants to perform most of the work which was required of him and paid them liberally and without objection from the estate, and where his individual work was, in the main, confined to a general supervision and direction of those subordinates, and to the keeping of his accounts. The ordinary (McGill) said: "Precedents in allowances of commissions to executors, however, afford but little assistance in fixing compensation. Each case must depend upon its own circumstances and be tested and controlled by the criterion intended by the statute—compensation." In *Weeks* v. *Selby, supra,* Justice Fort said: "However, the court does not consider that commissions to executors should be solely determined upon the basis of investment and reinvestment of the estate; but the question of the character of the estate, and the actual services in handling the estate by the executor, should all be carefully taken into account." The quantum of the estate, while not determinative, must not be left out of consideration. With respect to the rules governing allowance of counsel fees I need add nothing to what I said in the case of *Soper* v. *Bilder, 100 Atl. Rep. 858,* and in *Hitchcock* v. *American Pipe and Construction Company* on application for counsel fees, not yet reported. In *Soper* v. *Bilder* I said: "In computing what is reasonable compensation, many elements must be taken into account.

31

There is no yardstick by which the value of legal services can be measured; no rate per diem or percentages can be employed with justice to both parties. The legal ability of the attorney, the amount of work which he does, the skill with which he does it, and, of much importance, the amount involved, and the success of his efforts."

In order to appreciate the reasons which have induced me to reach the conclusion that I have it is necessary that there should be a brief resumé of the circumstances surrounding the administration of this estate. The testator died January 31st, 1914. There was a contest with respect to the probate of his will which was not determined in the court of errors and appeals until July, 1916. From February 27th, 1914, until July 21st, 1916, the Fidelity Trust Company acted as administrator *pendente lite* under appointment of the orphans court. That company performed so much of the executor's work as consisted in inventorying of the estate, reducing the estate to its possession, receiving and re-investing income (amounting to upwards of $200,000), paying debts amounting to $68,000; it did not convert the assets of the estate into money. It, of course, also performed valuable services during its administratorship in conserving and protecting the estate. For its services it was allowed by the orphans court, without objection from anyone, $35-000, which included its commissions and counsel fees. In July, 1916, the executor took over from the Fidelity Trust Company the assets of the estate. The principal taken over amounted to $1,954,590.92 inventoried value. Of this amount $1,850,377.57 was represented by stocks and other securities of about ninety different kinds in about seventy-five different corporations. Many of these stocks and bonds were inactive. Household goods and jewelry, paintings, &c., were also taken over at an inventoried value of $37,000, making a total inventoried value of principal of $1,976,999.93. The executor's first account filed in July, 1917, showed a total income received of $232,493.02, of which there had been received from the Fidelity, $187,366.12. At the time of the first accounting, July, 1917, the executor had liquidated assets of the estate at a gross increase over inventory

of $166,087.03. This represented the sale, among other things, in excess of, forty different kinds of securities. He had sold below the inventoried value some eighteen different kinds of securities, at a reduction of $32,787.57, showing a net increase of $133,299.46. At the time of the first accounting, the executor had transacted ninety-one separate sales of securities and had left in his hands some twenty-six securities, notes, &c., at an inventoried value of $102,250. He had disbursed $2,025,-103.46 represented by one hundred and seven vouchers, excluding those representing interest on legacies. There was some thirty-one legacies provided for in the will which were paid by the executor. Since the filing of the account in July, 1917, the executor has continued, under the orders of this court, to liquidate the estate; he has disposed of, or turned over to the residuary legatee, the assets which were in his possession at the time he filed the first account at a figure less than the inventoried value; some of the securities were absolutely worthless. But notwithstanding this, the estate shows, under his administration, a substantial increase in liquidation value over inventory. I pause to state that the inventory was made by the Fidelity Trust Company most carefully and represented, at the time it was made the best idea as to what the actual value of the estate was. The executor, although given the authority to distribute or pay over in kind, was obliged, in the exercise of his good judgment, to liquidate. His action was due to the fact that the residuary legatee, Harry G. Runkle, had assigned his interest in the residuary estate to between twenty-five and thirty assignees, and it was apparent that the residuary estate would not be sufficient, by a considerable amount of money, to cover the amounts secured by the assignments. In electing to liquidate he exercised good judgment and no one has objected. The liquidation of an estate of which over $1,800,000 was invested in stocks and bonds of numerous companies, many of which stocks and bonds were inactive, would be a great task in normal times. The liquidation of this estate was spread over the years 1916 and 1917 during the period of the war, and some portion of it after the United States entered into the war. The diffi-

culty and trouble of liquidation was, of course, tremendously increased, and that the liquidation has been accomplished without a shrinkage in the inventory value speaks volumes for the sagacity and industry of the executor and for the wisdom of the legal advice under which he acted. The executor was a member of a New York stock brokerage house, and placed at the disposal of the estate the services of his office. Most of the stock transactions went through his office and no commissions were charged. The inheritance tax laws of various states, as also their stock tax transfer laws, had to be considered and complied with, as also the income tax law of the United States. In this connection difficulty arose as to whether the increase in valuation of the estate in the hands of the executor should be considered as income or not, and the question thus raised took considerable of the time both of the executor and his counsel. The numerous assignments which had been made by the residuary legatee added difficulty to the administration of the estate. The executor has submitted affidavits attached to which is a resumé of daily services rendered which covers some thirty-eight closely typewritten pages.

In October, 1917, the bill in this case was filed by Harry G. Runkle, the residuary legatee. There were made parties the executor, the Fidelity Trust Company as holder of the trust fund of $750,000, created by the will, the income of which was to be paid Harry G. Runkle and his two children, Mary and Daniel, during their lives and then over, together also with all of those claiming, by assignment or otherwise, liens upon the residuary estate, and upon the income of the trust funds. Originally, there were some fourteen defendants. The defendants have now increased to over thirty. The executor appeared in the suit and consented to an administration of the estate therein with the result that this court took over the administration of the estate together also with the administration of the trust fund of $750,000 held by the Fidelity Trust Company. This course was necessary in order that numerous suits might be prevented, and that a very complicated situation should be dealt with in one cause in which all parties interested might appear. From

the filing of that suit down to the present time the administration of the estate has been under the eye of the court, and I have personal knowledge of the care with which both the executor and his counsel have acted. I am convinced that the allowance which the executor asks for, to wit, $75,000 in all for his services, is not excessive and it will be allowed. This is equivalent to about three and one-fourth per cent. on the amount which the objecting assignees admit commissions should be allowed upon, to wit, $2,289,000. It is argued by the objecting assignees that the $35,000 already paid to the administrator *pendente lite* should be taken into consideration. The fact that the administrator *pendente lite* has been paid $35,000 can only be taken into consideration so far as the work done by the administrator *pendente lite* relieved the executor of work. In estates under $50,000, by force of the statute, an administrator *pendente lite* and an executor receive the same fees and there is a double charge to the estate. The test which should be applied in allowing commissions to this executor is compensation for the actual services rendered by him, and in considering that compensation there is to be taken into account the amount of the estate, his pains, trouble and risk. But even taking into consideration the amount heretofore allowed to the administrator *pendente lite*, the total allowance for commissions is less than the statutory maximum of five per cent. I can hardly conceive of any situation where a maximum allowance would be justified if this is not one.

So far as the executor asks permission to charge against the estate the $2,500 sums paid to Archer and Smith, the application will be denied for the reason that the affidavits submitted are not sufficiently precise to warrant the court in placing any value upon their services. Whatever services Archer or Smith performed for the estate must be considered as embraced within the services performed by the executor for which the additional allowance of $25,000 will be made.

The executor was justified in view of the situation of the estate in having the assistance of counsel. Counsel have brought or defended some ten separate suits. They have attended to the

inheritance tax matters as well as the transfer tax. Their services are enumerated in some twenty-one pages of closely typewritten matter. They have attended both in the orphans court and in this court continuously during the past two years. They have been obliged to consider questions with respect to the construction of the will as to whether the tax on the share of the legatees over should be paid by the executor out of the residuary estate or out of the trust funds. They have been obliged to consider the income tax law and also the effect of the numerous assignments. They have heartily co-operated in the conduct of this case with the result that the estate has been distributed as expeditiously as it has, and with as little litigation. Again, since the institution of these proceedings, I have had personal knowledge of the work performed by counsel. They have kept in touch with the court as the work progressed. The pleadings on file in this cause, among others, those in which they have asked for the instructions of the court with respect to the disposal of securities, &c., will indicate, to some extent, the amount of work done. I am convinced that the amount which they ask in addition to the $25,000, to wit, $10,000, is not excessive and it will be allowed.

Counsel for complainant in the cause asks for $7,500 additional, or a total allowance of $11,000, he having already received $3,500. I cannot speak too highly of the work performed by Mr. Moore in this case. The situation at the time he came into it representing Harry G. Runkle, the residuary legatee, was most involved. He worked out the scheme of filing the bill which resulted in the administration of the estate in this court. As before stated, there were some fourteen defendants at the time the bill was filed, many of them non-residents and the number has been increased from time to time so that there are now over thirty. The fact that the litigation has been completed in one suit is no indication of the amount of work done. If the litigation had not been taken over in the manner that it was there would have been many independent suits. Complainant's counsel has kept the record in shape from the time of the institution of the suit down to the present time. The work in this

case which would, in an ordinary case, be considered routine work had to be performed by Mr. Moore personally. In view of the numerous assignments with their different provisions and the fact that the court was administering in one suit two trust funds, extreme care had to be taken in orders disbursing the residuary estate and the income that over or improper payments be not made. Counsel has been called upon, during the course of the litigation, to argue and submit briefs on five distinct propositions, some of them, indeed I may say most of them, novel. He has been some twenty-one times in court and never uselessly. The memorandum of services which he has submitted covers some twenty-seven typewritten pages. I think that a total payment to him of $10,000, or $6,500 more than he has already received, will not be excessive and it will be allowed.

An argument was made by the objecting assignees to the effect that the court should give some consideration to the fact that many of these assignees, because the residuary estate is less than Harry G. Runkle thought it would be, will not be paid. A moment's reflection will indicate that no consideration should be given to this fact. The assignees of Harry G. Runkle stand in the shoes of Harry G. Runkle and are entitled to no higher or greater rights. They took with their eyes open. Much of the difficulty and embarrassment under which the executor and his counsel have labored has been occasioned by the act of the residuary legatee in making the assignments that he did. For the trouble that he, by his act, has put the executor and his counsel to, they must be paid and he and his assignees must bear the expense. In awarding compensation I look upon the case precisely the same as if the assignments had not been made, listening, however, to what the assignees may say because of the fact that they stand in the shoes of Harry G. Runkle. As it is the assignees have fared much better than anyone imagined they would at the start, and it now looks as if there is a fair chance that eventually all will be paid.

During the argument attention was called also to the fact that various fees had been paid out of this estate in preceding litigation. With that I have no concern. The litigation was over

the probate of the will and was not the fault of the executor or in anywise due to him and to the allowances that were made in that litigation no objection was made. It is a fact that Messrs. Church & Harrison, who are counsel for the executor here, received in that litigation but a comparatively small amount as allowance. What I am considering on this application, and all that I am considering, is compensation for the actual services performed by the executor and his counsel and counsel for the complainant as disclosed by the record. If an appeal is taken to the court of errors and appeals, then there must be considered as a part of the record on appeal at least a summary of the proceedings in this cause. All of the pleadings and documents in this cause have been considered by me in reaching the conclusion that I have. It will not, of course, be necessary to print the record in full, but, in the absence of this, a summary must be prepared, satisfactory to the court, which will indicate to the court of errors and appeals somewhat the nature of the proceedings.

In the fore part of this memorandum I indicated that all counsel for the objecting assignees had insisted that the executor and his counsel had been overpaid. I find by my notes that Mr. Egner conceded that counsel for the executor was entitled to a further allowance but not the amount asked.

I might also add that all parties express their appreciation of the work done by the executor and his counsel and counsel for complainant. No criticism has been made upon either. The trouble, as I conceive it, is that counsel for the objecting assignees are not cognizant of the real amount of work done.

In considering the amounts asked for and allowed it must not be overlooked, as I attempted to point out in the *Hitchcock Case,* that we are passing upon the value of services performed during the years 1916, 1917 and 1918 at a time when the value of the dollar was steadily declining. I am quite convinced that on the average during the time that the services were performed a dollar was not worth to a lawyer certainly not in excess of seventy cents, so that figured upon the basis of the value of the dollar in 1914 and preceding, the amount allowed to the executor

would be approximately $52,500, while the amount allowed to counsel for the executor would be approximately $24,500, and the amount allowed to counsel for complainant would be approximately $7,000. The decrease in the value of the dollar is not a temporary thing. All indications are that it is permanent, and that the fees of lawyers and other persons engaged in the professions must be readjusted. I do not mean to intimate by this that if I were compelled to fix the fees upon the basis of the valuation of the dollar in 1914 that I would allow any less fees than I have fixed.

An opportunity was given to counsel for the objecting parties to cross-examine the executor, his counsel and counsel for complainant. This opportunity they failed to take advantage of so that the court has been obliged to consider the affidavits, &c., filed by the applying parties without having the statements therein contained subjected to the test of cross-examination.

In view of the fact that some portion of the litigation had to do with the application of the trust fund of $750,000 created by the will, held by the Fidelity Trust Company, the income of which is to be paid equally, during their lives, to Harry G. Runkle and his two children, Mary and Daniel, it seems to me that this trust fund, or the income thereof, should bear a pro-portion of the counsel fees allowed to counsel for complainant, and I will charge against the income accruing to Harry G. Runkle of the amount allowed to counsel for complainant $1,000, and against the income accruing to Mary Runkle Heiberg $500, and against the income accruing to Daniel Runkle $500, making a total charge of $2,000 against the income and $8,000 against the residuary estate. Counsel have not had an opportunity to be heard upon this last proposition, and if they desire to be heard they may move to modify the order I have signed.

I have signed the order passing the final accounts and fixing the fees as hereinabove set forth.